**EXHIBIT-A**

SOCIAL SECURITY ADMINISTRATION

## DISABILITY DETERMINATION AND TRANSMITTAL

| 1. DESTINATION | 2. DDS CODE | 3. FILING DATE | 4. SSN | BIC (if CDB or DWB CLAIM) |
|---|---|---|---|---|
| DDS [X] ODO [ ] DRS [ ] DQB [ ] INTPSC [ ] | 104 | 03/06/02 | (redacted) | 00 |

**5. NAME AND ADDRESS OF CLAIMANT (include ZIP Code)**

Lisa Hamilton
5260 Long Rd   Apt A
Orlando   FL 32808

**6. WE'S NAME (if CDB or DWB CLAIM)**

**7. TYPE CLAIM (Title II)**
DIB [X]  FZ [ ]  DWB [ ]  CDB-R [ ]  CDB-D [ ]  RD-R [ ]  RD-D [ ]  RD [ ]  P-R [ ]  P-D [ ]  MQFE [ ]

**8. TYPE CLAIM (Title XVI)**
DI [ ]  DS [ ]  DC [ ]  BI [ ]  BS [ ]  BC [ ]

**9. DATE OF BIRTH:** 08/05/1970

**10. PRIOR ACTION:** PD [ ]  PT [ ]

**11. REMARKS:**
Clmt Phone: 407-291-9286
Concurrent Title II/XVI claim
DDS Received 03/12/02

**12. DISTRICT-BRANCH OFFICE ADDRESS (include ZIP Code)**
Orlando
80 N Hughey Avenue   Room 159
Orlando   FL 32801

**DO-BO CODE:** 657

**11A.** Presumptive Disability [ ]
**11B.** Impairment [ ]

**13. DO-BO REPRESENTATIVE**   **14. DATE**

### DETERMINATION PURSUANT TO THE SOCIAL SECURITY ACT, AS AMENDED

**15. CLAIMANT DISABLED**
A. [X] Disability Began   12/01/99
B. [ ] Disability Ceased

**16A. PRIMARY DIAGNOSIS:** Anxiety Related Disorder
**BODY STS.:** 12   **CODE NO.:** 3000

**16B. SECONDARY DIAGNOSIS:** NONE   **CODE NO.:** 0000

**17. DIARY TYPE:** MRN   **MO./YR.:** 05/01/05   **REASON:** 3

**18. CASE OF BLINDNESS AS DEFINED IN SEC. 1614(a)(2)/(216)(i)**
A. [ ] Not Disab. for Cash Bene. Purp.
B. [ ] Disab. for Cash Benefit Purp. Beg.

**19. CLAIMANT NOT DISABLED**
A. [ ] Through Date of Current Determination
B. [ ] Through _____
C. [ ] Before Age 22 (CDB only)

**20. VOCATIONAL BACKGROUND:** 000 000
OCC YRS.   ED YRS.

**21. VR ACTION**
SC IN  A. [ ]
SC OUT B. [X]   C. [ ]

**22. REG-BASIS CODE:** C1 -
**23. MED LIST NO.**
**24. MOB CODE**
**25. REVISED DET** [ ]

**25A.** Initial A. [X]   Recon B. [ ]   Recon DHU C. [ ]   ALJ Hearing D. [ ]   Appeals Council E. [ ]   U.S. District Court F. [ ]

**26. LIST NO.**  A. ▶  B.  C.  D.  E.  F.

**27. RATIONALE:** [X] See Attached SSA-4268-U4/C4   [ ] Check if Vocational Rule Met. Cite Rule ▶

**28.**
A. [X] Period of Disability   B. [ ] Disability Period   C. [X] Estab Beg _____ AND   D. [ ] Continues   E. [ ] Term _____

**29. LTR/PAR NO.**

**30. DISABILITY EXAMINER-DDS:** M. Jeannette   127
**31. DATE:** 4/20/02

**32. PHYSICIAN OR MEDICAL SPEC. SIGNATURE:** See PRTF dated 3/18/02
**33. DATE:** 3/18/02

**32A. PHYSICIAN OR MEDICAL SPEC. NAME:** Jeffrey Prickett, PyD
**32B. SPEC. CODE:** 38

**34. REMARKS:** Change of Onset

MULTIPLE IMPAIRMENTS CONSIDERED
34A. COMBINED MULTIPLE NONSEVERE-SEVERE
34B. COMBINED MULTIPLE NONSEVERE-NONSEVERE

**35. BASIS CODE:** C1
**36. REV.DET. CODES**
**37. SSA REPRESENTATIVE:** (signature) Lawson
**SSA CODE:** 32
**38. DATE:** 7/19/02

Form SSA-831-C3 (5/89)

EXHIBIT E

technology," [i.e., assistive technology (AT)] that are connected to a person's vocational goal.

G. Congress has stated that VR services are to empower individuals to maximize employability, economic self-sufficiency, independence and integration into the workplace and the community through comprehensive and coordinated state-of-the-art programs. *Id.* § 701(b)(1)(emphasis added).

## II. Basic Eligibility Criteria

A. To receive services an individual must be disabled [*see id.* § 720(20)(A)] and require VR services to prepare for, enter, engage in, or retain gainful employment. *Id.* § 722(a)(1).

B. Potential employment outcomes were expanded by Rehab '98.

   1. Employability had been defined as full or part-time competitive employment to the greatest extent practicable, supported employment or other employment consistent with the individual's strengths, abilities, interests and informed choice. 34 C.F.R. § 361.5(b)(15).

   2. Rehab '98 adds self-employment, telecommuting and business ownership as successful employment outcomes. 29 U.S.C § 705(11)(C).

C. Persons must show a mental, physical or learning disability that interferes with the ability to work.

   1. The disability need not be so severe as to qualify the person for Social Security Disability Insurance (SSDI) or Supplemental Security Income (SSI) benefits.

   2. The disability must only be a substantial impediment to employment. 29 U.S.C. § 705(20)(A).

   3. The Rehabilitation Act Amendments of 1998 (Rehab '98) change the designation of individual with a severe or most severe disability to individual with a significant or most significant disability. 20 U.S.C. § 705(21).

   4. Recipients of SSDI or SSI are presumed to be eligible for VR services, as individuals with a significant disability, provided they intend to achieve an employment outcome. 29 U.S.C. § 722(a)(3).

D. Although VR services may be denied if a person cannot benefit from them, a person is presumed capable of employment despite the severity of a disability unless the VR agency shows by clear and convincing evidence that he or she cannot benefit from services. 29 U.S.C. § 722(a)(2); 34 C.F.R. § 361.42(a)(2).

E. Prior to determining that a person with a severe disability is incapable of benefitting from VR services, the state VR agency must conduct an extended evaluation. 34 C.F.R. § 361.42(d).

F. In order of selection states, where not all potentially eligible individuals with disabilities will be able to receive VR services, Rehab '98 makes some provision for those who are not served.

   1. They are entitled to an appropriate referral to other State and Federal programs, including other providers within the State workforce investment system. 29 U.S.C. § 721(a)(5)(D) and (20).

   2. The State VR agency must enter into an agreement with other providers within the statewide workforce investment system, which may include intercomponent staff training and technical assistance

May provide special benefits, beyond those required by the regulation, to individuals with disabilities.

May not place special charges on individuals with disabilities to cover the costs of measures necessary to ensure nondiscriminatory treatment, such as making modifications required to provide program accessibility or providing qualified interpreters.

Shall operate their programs so that, when viewed in their entirety, they are readily accessible to and usable by individuals with disabilities.

## III. "Qualified Individuals with Disabilities"

Title II of the Americans with Disabilities Act provides comprehensive civil rights protections for "qualified individuals with disabilities."

An "individual with a disability" is a person who --

Has a physical or mental impairment that substantially limits a "major life activity", or

Has a record of such an impairment, or

Is regarded as having such an impairment.

Examples of physical or mental impairments include, but are not limited to, such contagious and noncontagious diseases and conditions as orthopedic, visual, speech, and hearing impairments; cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism. Homosexuality and bisexuality are not physical or mental impairments under the ADA.

"Major life activities" include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Individuals who currently engage in the illegal use of drugs are not protected by the ADA when an action is taken on the basis of their current illegal use of drugs.

"Qualified" individuals.

A "qualified" individual with a disability is one who meets the essential eligibility reqirements for the program or activity offered by a public entity.

The "essential eligibility requirements" will depend on the type of service or activity involved.

For some activities, such as State licensing programs, the ability to meet specific skill and performance requirements may be "essential."

For other activities, such as where the public entity provides information to anyone who requests it, the "essential eligibility requirements" would be minimal.



# LII
### legal information institute

Collection home

# US CODE COLLECTION

Search

EXHIBIT G

Donate

Prev | Next

TITLE 29 > CHAPTER 16 > SUBCHAPTER I > Part A > § 722

## § 722. Eligibility and individualized plan for employment

*Release date: 2003-05-15*

### (a) Eligibility

#### (1) Criterion for eligibility

An individual is eligible for assistance under this subchapter if the individual—

**(A)** is an individual with a disability under section 705 (20)(A) of this title; and

**(B)** requires vocational rehabilitation services to prepare for, secure, retain, or regain employment.

#### (2) Presumption of benefit

##### (A) Demonstration

For purposes of this section, an individual shall be presumed to be an individual that can benefit in terms of an employment outcome from vocational rehabilitation services under section 705 (20)(A) of this title, unless the designated State unit involved can demonstrate by clear and convincing evidence that such individual is incapable of benefiting in terms of an employment outcome from vocational rehabilitation services due to the severity of the disability of the individual.

##### (B) Methods

In making the demonstration required under subparagraph (A), the designated State unit shall explore the individual's abilities, capabilities, and capacity to perform in work situations, through the use of trial work experiences, as described in section 705 (2)(D) of this title, with appropriate supports provided through the designated State unit, except under limited circumstances when an individual cannot take advantage of such experiences. Such experiences shall be of sufficient variety and over a sufficient period of time to determine the eligibility of the individual or to determine the existence of clear and convincing evidence that the individual is incapable of benefiting in terms of an employment outcome from vocational rehabilitation services due to the severity of the disability of the individual.

*Search this title:*

[ Search Title 29 ]

Notes
Updates
Parallel authorities (CFR)
Your comments

EXHIBIT-H

# FLORIDA DEPARTMENT OF EDUCATION



STATE BOARD OF EDUCATION

F. PHILIP HANDY, *Chairman*
T. WILLARD FAIR, *Vice Chairman*
Members
SALLY BRADSHAW
LINDA J. EADS, ED.D.
CHARLES PATRICK GARCIA
JULIA L. JOHNSON
WILLIAM L. PROCTOR, PH.D.

JIM HORNE
Commissioner of Education

*Just Read, Florida!*

11/25/2003

Lisa Hamilton
4470 Scenic Lake Dr
Orlando, Florida  32808

Dear Ms Hamilton:

At our last meeting we thoroughly reviewed and discussed your evaluation reports. It has been determined that you are not eligible for vocational rehabilitation services because your disability is too severe at this time for rehabilitation services to result in an employment outcome.     This decision was reached 19 November 2003 and confirmed on 25 November 2003.

I believe the following agency could be of assistance to you. Please contact them at your convenience.

Lakeside Alternatives
434 W Kennedy Blvd
Orlando, Florida  32810

If you disagree with this decision you have the right to appeal it within twenty-one (21) days after you receive this letter by requesting in writing either:

- An Administrative Review by the Area Director by sending your request to:

James Shalls
3555 Maguire Blvd., Ste 205
Orlando, Fl  32803

LORETTA COSTIN
*Director, Division of Vocational Rehabilitation*

3191 Maguire Blvd., Ste. 246, 506 • Orlando, Fl  32803 • (407) 897-2710

Toll Free: 1-800-451-4327 (Voice or TTY) • In Tallahassee: 850-245-3399 (Voice or TTY) • FAX: 850-245-3392
Florida Relay Service:  1-800-955-8771 (TTY) • 1-800-955-8770 (Voice) • www.fldoe.org
DOE/VR-VCMT027  (Rev. 03/03)

EXHIBIT-I Pg.1

# LEARNING DISABILITY ASSESSMENT / PSYCHOLOGICAL EVALUATION

**NAME:** Lisa Hamilton  
**DOB:** 08/05/1970  
**AGE:** 33  

**DOE:** 10/09; 10/14/2003  
**Examiner:** Joyce A. Wells, Psy.D.  
David E. Bogert, M.S.

## REASON FOR REFERRAL:

Lisa Hamilton is a 33 year-old female who was referred by Judy Whitaker of Vocational Rehabilitation for a learning disability assessment to determine her current level of intellectual functioning and the presence and severity of any learning disabilities. In addition, a personality evaluation was requested to determine her current mental status, psychological functioning, and emotional needs. Results of the evaluation will be used to assist in determining appropriate placement and training for Lisa.

## TESTS ADMINISTERED:

Clinical Interview  
Mental Status Evaluation  
Wechsler Adult Intelligence Scale-Third Edition (WAIS-III)  
Woodcock-Johnson III Tests of Achievement, Form A (WJ-III)  
Minnesota Multiphasic Personality Inventory-2 (MMPI-2)  
Rotter Incomplete Sentences Blank  
Bender Visual Motor Gestalt  
Projective Drawings  

## BRIEF HISTORY:

Historical information was provided by Lisa and was disjointed in its presentation. Lisa was verbose and tangential. Lisa reports dealing with panic and anxiety for most of her life; she is phobic about riding in elevators, and requires the window open when she rides in a car. She has been in counseling and been treated with medications. Lisa was taking Zoloft, which she states "worked for a while," but she continued to have panic attacks. Wellbutrin was added to her medication regime and this also worked for a time. Lisa is currently under the care of a psychiatrist through Central Florida Psychiatric Association, and is taking Xanax and Zoloft. She feels this medication has reduced many of her symptoms, but she continues to experience one to two days of panic per week, and continues to feel "down." She is not currently attending any counseling, and she discontinued treatment with her last therapist because they "did not connect." No psychiatric hospitalizations were reported. Her mother and sister are reported to suffer from similar symptoms of anxiety and depression.

Comprehensive Behavioral Health  
Sun Trust Plaza, 3359 West Vine Street, Suite 104; Kissimmee, FL 34741  
Tel: 407-933-7788   Fax: 407-933-2886

Comprehensive Behavioral Health

EXHIBIT-I Pg. 2

Lisa describes a history of abuse and family problems. She was raised in foster care until age 18, and indicated many of the placements were emotionally abusive. Lisa has been married for nine years and has three children ages 7, 4, and 2. She describes her relationship as "not good," indicating she and her spouse do not get along well and often argue; however, she also stated he is supportive of her ideas.

Medically, Lisa underwent open heart surgery in the first grade. She could provide no other information about the surgery, and stated her mother would not discuss it. She has also been diagnosed with Mitral Valve Prolapse and Hypoglycemia. Most recently Lisa was involved in an auto accident and has been experiencing neck pain.

Lisa has a standard high school diploma, and attended college for a "few years" earing 30 college credits. She earned a real estate license and worked in time share sales for three years. Lisa feels she did well in this type of work, but left because of her anxiety and stress. Her real estate license is currently inactive. Two years ago, Lisa was awarded disability for her the Mitral Valve Prolapse, anxiety, depression, and phobias. She has remained on disability, but is in the process of starting her own song and music writing business. Lisa began working on this business three months ago, and she has already formed a corporation. She also has a web page "Americanbird.org" to promote her projects. When questioned about her business plans, Lisa described writing songs and creating a demo to send off to people she believe would be able to sing or use the song. For example, she described writing a song for Whitney Houston and submitting that song directly to her. She also described creating the Americanbird logo and submitting it to higher level politicians to potentially be used in a political campaign. She had no other business plan or long range business goals. Lisa is seeking assistance from Vocational Rehabilitation to help fund this business.

No arrest history or legal difficulties were reported. Lisa does not drink alcohol, use illicit drugs, or tobacco. She describes her hobbies as "talking, music, singing, and making people feel good about themself."

**MENTAL STATUS AND BEHAVIORAL OBSERVATIONS:**

Lisa Hamilton is a 33 year-old female who appears her stated age. She was on time for the evaluation, and testing was completed over two sessions. Lisa is verbose and quite histrionic. This is evident in her style of communication. She begins describing information in a well modulated tone, but becomes increasing loud and demanding in attempts to get her point across. Once Lisa began talking about a topic, she had to be redirected to the original question. Lisa was cooperative and attempted all tasks. Her speech typically contained statements such as "Wow," "Your kidding me," "Oh my," and "Isn't that something" with accompanying dramatic gestures and expressions. On many tasks, she demonstrated an obsessiveness about producing the right answer, even after prompts from the examiner to move to the next item. Her hygiene and grooming were good, and she was well dressed. She was alert, and oriented to person,

EXHIBIT I Pg. 3

*Learning Disability Assessment / Psychological Evaluation*
*Lisa Hamilton*
*Page 3 of 9*

place, and time. There was no evidence of auditory or visual hallucinations. Her thought process concerning her business had a grandiose tone. A history of difficulties with anxiety, phobias, panic, and depression were reported. She reports her mood as anxious, but did not demonstrate anxiety symptoms during the evaluation. Her affective responses were bright, energetic, and somewhat labile. Lisa reports no major changes in sleep, appetite or weight. There was no evidence of significant difficulties with speech, vision, or hearing. Her level of conversational proficiency was adequate. Her insight is limited, and her judgment and reasoning are questionable. There was evidence of difficulties with concentration and distractibility. Her short term was fair, and long term memory was good. There were no significant abnormalities in gait, gross or fine motor coordination observed. Overall, this appears to be an accurate estimate of Lisa's current intellectual capabilities.

## WAIS-III RESULTS:

| Verbal Subtests | Age Corrected Scaled Scores | Performance Subtests | Age Corrected Scaled Scores |
|---|---|---|---|
| Vocabulary | 13 | Picture Completion | 8 |
| Similarities | 8 | Digit Symbol-Coding | 8 |
| Arithmetic | 8 | Block Design | 7 |
| Digit Span | 7 | Matrix Reasoning | 13 |
| Information | 9 | Picture Arrangement | 9 |

*Learning Disability Assessment / Psychological Evaluation*
*Lisa Hamilton*
*Page 4 of 9*

| Comprehension | 10 | Symbol Search | 8 |
|---|---|---|---|
| Letter-Number Sequencing | 6 | | |

*Verbal IQ Score: 94  (34%tile)     Performance IQ Score: 92  (30%tile)*
*Full Scale IQ Score: 94  (34%tile)*

| Scale | Index Score | Percentile |
|---|---|---|
| Verbal Comprehension Index | 100 | 50 |
| Perceptual Organization Index | 95 | 37 |
| Working Memory Index | 82 | 12 |
| Processing Speed Index | 88 | 21 |

On this administration of the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), Lisa achieved a Verbal IQ Score of 94, a Performance IQ Score of 92, and a Full Scale IQ Score of 94. This places her current, overall intellectual functioning in the Average range of abilities. She performed equally as well on nonverbal reasoning tasks as on verbal reasoning tasks. There is no significant difference between her ability to reason with words and to reason without the use of words.

There was substantial variability in her performance across verbally-related subtests and moderate variability across perceptual subtests. In comparison to same aged peers, Lisa exhibited significant strengths on tasks tapping language development and word knowledge, practical and conceptual organization, ordering and planning, abstraction ability, and cognitive flexibility. Significant weaknesses in comparison to peers were exhibited immediate auditory memory, analysis and synthesis of visually presented material, nonverbal concept formation, and spatial visualization.

Relative to her own level of performance on verbal and perceptual tasks, Lisa demonstrated significant strengths in tapping language development and word knowledge, practical and conceptual organization, ordering and planning, abstraction ability, and cognitive flexibility. No significant weaknesses compared to herself were evidenced.

Overall, Lisa is functioning in the Average range of intellectual abilities. She should be able to learn new tasks at a level consistent with her peers. She will be able to perform activities

EXHIBIT-I Pg.5

*Learning Disability Assessment / Psychological Evaluation*
*Lisa Hamilton*
*Page 5 of 9*

involving verbal skills at the same rate than she can tasks which involve visual-motor skills. Individuals of similar intellectual ability usually function best in semiskilled or skilled occupations. Minimal need of supervision as well as totally independent job functioning may be evidenced.

**WOODCOCK-JOHNSON III Tests of Achievement:**

| Test | Raw | Age Equivalent | Percentage | Standard Score | Grade Equivalent |
|---|---|---|---|---|---|
| Letter-Word Identification | 68 | 17-5 | 44 | 98 | 12.7 |
| Reading Fluency | 53 | 12-3 | 23 | 89 | 6.9 |
| Calculation | 26 | 15-2 | 53 | 101 | 9.7 |
| Math Fluency | 81 | 12-1 | 11 | 82 | 6.7 |
| Spelling | 46 | 17-8 | 52 | 101 | 12.9 |
| Writing Fluency | 12 | 9-0 | 11 | 82 | 3.6 |
|  |  |  |  |  |  |

*Learning Disability Assessment / Psychological Evaluation*
*Lisa Hamilton*
*Page 6 of 9*

| Passage Comprehension | 38 | 19 | 45 | 98 | 12.5 |
| --- | --- | --- | --- | --- | --- |
| Applied Problems | 48 | 16-2 | 35 | 94 | 12.5 |
| Writing Samples | 10-D | 10-3 | 22 | 88 | 4.8 |
| **Broad Reading** | | 14-3 | 32 | 93 | 9.0 |
| **Broad Math** | | 14-8 | 33 | 93 | 9.5 |
| **Broad Written Language** | | 11-6 | 26 | 90 | 6.0 |

On this administration of the Woodcock-Johnson-III Achievement Tests, Lisa obtained a Total Achievement score of 92 which places her in Average range of overall academic abilities and at the 30th percentile. This indicates Lisa will perform academic work at a level consistent with same aged peers. Lisa's own predicted academic abilities as determined by the WAIS-III, suggest that she is performing at levels consistent with her own expected level of academic achievement.

Her performances on Broad Reading, Broad Math, and Broad Written Language all fall within the Average range and correspond to the 93rd, 93rd, and 90th percentiles, respectively.

When her performance is compared to her predicted academic levels, Lisa demonstrated no significant strengths or significant weaknesses. Lisa did not demonstrate any areas of academic weaknesses that would constitute a specific learning disability.

In terms of her overall academic abilities, Lisa's knowledge of basic academic skills is in the Average range and at the 48th percentile. The speed and rate at which she can apply basic academic skills is in the Low Average range and at the 81st percentile. Her ability to apply

*Learning Disability Assessment / Psychological Evaluation*
*Lisa Hamilton*
*Page 7 of 9*

academic skills to solve academic problems is in the Average range and at the 37th percentile. This indicates that Lisa should have no difficulty in programs that rely on academically based skills.

**PERSONALITY RESULTS:**

On this administration of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) Lisa presents a good front combined with repression and conscious denial. She emphasized moral issues, her own integrity, and scrupulousness. She is also rigid, naively defensive, self-centered, and uncompromising. Lisa will tend to deny or gloss over unfavorable traits and have little insight into her own motives and behavior. She is prone to situational stress and acute neurosis with a high probability of an underlying character disorder. Lisa indicates a significant number of psychological and emotional problems. She expresses excessive concern about multiple somatic complaints, and while these may have a medical basis, she will use these complaints to control and manipulate others. She is typically self-centered, dissatisfied, demanding of attention, and complaining. When stressed, Lisa will develop increased physical complaints, but lacks insight into the causes of these symptoms. Although admitting to numerous psychological problems, she is resistant to psychological interpretations and treatment, and most forms of therapeutic intervention will be difficult, as she will look for simplistic, concrete solutions that do not require self-examination. When events do not proceed as Lisa expects, she can become angry, belligerent, and resentful of rules and regulations. Anything perceived as thwarting her goals will be met with agitation, aggression, and highly demanding behaviors. She is likely to be impulsive, unreliable, and irresponsible. Periods of poor judgment and planning can observed. Lisa usually makes a good first impression, but this quickly deteriorates as she becomes more demanding that things be done her way. As her hostility increases, she feels as if she is being mistreated or misused. Lisa endorsed items indicating excessive worry and problems in concentration. She may experience irrational fears and ruminate about her problems. Her scores are also suggestive of confused thinking and distorted perceptual processes. Difficulties in logic and planning are also problematic. Lisa finds it difficult to relax and tends to start many projects, but finds it difficult to see them through to completion. Others may see her has emotionally labile, impulsive, grandiose, verbose, and unpredictable.

Results of the projective tests characterize Lisa as unjustifiably optimistic with high achievement aspirations that likely out strip her actual abilities. She is assertive, forceful, and ambitious until frustrated when she will likely become aggressive, excitable, and impulsive. As she becomes increasingly frustrated and stressed, the range of coping behaviors available becomes constricted. Typically, Lisa will become extremely tense, hostile, aggressive, and dominant along with developing some paranoid mentation, emotional lability, and confusion in

EXHIBIT I Pg 8

*Learning Disability Assessment / Psychological Evaluation*
*Lisa Hamilton*
*Page 8 of 9*

thought processes. Her strong drive level and excessive striving have resulted in precarious and poor emotional adjustment. When Lisa's emotional resources are depleted an agitated depressive state may manifest.

**DIAGNOSTIC IMPRESSIONS:**

| | | |
|---|---|---|
| **AXIS I:** | 300.21 | Panic Disorder With Agoraphobia |
| | 311 | Depressive Disorder NOS |
| **AXIS II:** | 301.50 | Histrionic Personality Disorder |
| **AXIS III:** | | Mitral Valve Prolapse, Hypoglycemia, Neck Pain |

**SUMMARY AND RECOMMENDATIONS:**

1. Overall, Lisa is functioning in the Average range of intellectual abilities. Her ability to apply and utilize perceptual motor skills is consistent with her verbal aptitude. Lisa will learn new information at a rate consistent with her peers.

2. Academically, there are no indications of specific learning disabilities in reading, mathematics, spelling, or writing.

3. Lisa is unpredictable, grandiose, impulsive, and displays some confusion in thought process. She is likely to generate an idea, act with little forethought and planning, and become angry and hostile when her idea does not come to fruition. When this happens, Lisa responds with open aggression and hostility blaming others for impeding her progress. She has limited coping skills, and her symptoms deteriorate rapidly under stress triggering increased anxieties, agitation, and poor judgment.

4. Essentially, Lisa's psychological symptoms are not stable. Her precarious adjustment will rapidly deteriorate under minimal amounts of stress. Lisa is under the care of a psychiatrist and will need to remain in treatment. It may be possible to further stabilize her through medication, or it is possible that Lisa is at her peak level of stability. Consultation with her treating psychiatrist about the possibility for improved stabilization and eventual return to the workforce is suggested.

5. Individual counseling should be brief and symptom focused. Lisa is likely to require long term treatment with the potential for only minimal sustained changes occurring.

6. Lisa would like assistance starting her own business in music and song writing. While she may have a talent in this area, her mental state is not stable enough to cope with the stress of owning and operating a small business at this time.

EXHIBIT-I Pg.9

*Learning Disability Assessment / Psychological Evaluation*
*Lisa Hamilton*
*Page 9 of 9*

7. In addition, her current approach to developing a business is a good example of her ability to generate ideas without thinking it through in a realistic way. Lisa has no clear, short or long range business goal; she has a series of ideas, some of which are grandiose, but no practical plan for moving a business forward.

8. After maintaining six months improved stability, Lisa may want to return to work beginning with part-time and moving toward full-time employment, as long as it does not cause decompensation in her psychiatric condition.

Thank you for the opportunity to be of assistance to you with this case; please contact me if I can provide any additional information.


Joyce A. Wells, Psy.D.
Licensed Psychologist PSY18387

authority to approve an appropriate supervisor. The list of potential supervisors must be submitted within one week from the entry of the Final Order. The supervisor and Dr. Wax must meet weekly face-to-face and the supervisor must review all of Dr. Wax's client records since the last meeting. The supervisor is to report any concerns of unethical behavior at once and must submit a written report prior to the April 2004 meeting.

The meeting adjourned at 10:54 a.m. and reconvened at 11:08 p.m.

## PROSECUTOR'S REPORT

Tab 3         Richard Shoop, Prosecuting Attorney

Mr. Shoop presented a prosecutor's report outlining the current status of the 20 discipline case

## ADMINISTRATIVE PROCEEDINGS

### HEARING NOT INVOLVING DISPUTED ISSUES OF MATERIAL FACT

Tab 4         Charles Aronovitch – (endorsement of other state license) Connecticut 2002

Ms. Mary Ellen Clark introduced the case to the board. Dr. Aronovitch was present and sworn in by the court reporter. Dr. Aronovitch was not represented by counsel.

Dr. Aronovitch's application was reviewed at the May 23, 2003 meeting and was denied because the law under which Dr. Aronovitch was licensed was not substantially equivalent to Florida law. Following discussion, the board took the following action.

Dr. Richard Hoffman moved to rescind the denial. Ms. Cheryl Levine seconded the motion, which carried 4/1. Dr. Herbert Goldstein opposed.

**To summarize,** Dr. Aronovitch's initial denial was rescinded and he has been approved for licensure pending passage of the laws and rules examination.

### PETITION FOR A HEARING INVOLVING DISPUTED ISSUES OF MATERIAL FACT


Tab 5         Joyce Wells – (endorsement of other state license) California 2002

Ms. Mary Ellen Clark introduced the case to the board.

Dr. Wells' application was reviewed at the November 14, 2003 meeting and was denied because the law under which Dr. Wells was licensed was not substantially equivalent to Florida Law.

The board received a Request for Continuance on January 27, 2004.

Dr. Herbert Goldstein moved to grant a continuance until the April 2004 meeting. Ms. Cheryl Levine seconded the motion, which carried 5/0.

Ms. Mary Ellen Clark provided guidance to the board regarding the application method endorsement of other state license. Ms. Clark described three methods the board could use to determine eligibility for licensure.

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



EXHIBIT-K Pg. 1



# Title II Highlights

I. Who is covered by title II of the ADA

II. Overview of Requirements

III. "Qualified Individual with a Disability"

IV. Program Access

V. Integrated Programs

VI. Communications

VII. New Construction and Alterations

VIII. Enforcement

IX. Complaints

X. Designated Agencies

XI. Technical Assistance

## I. Who is Covered by Title II of the ADA

The title II regulation covers "public entities."

"Public entities" include any State or local government and any of its departments, agencies, or other instrumentalities.

All activities, services, and programs of public entities are covered, including activities of State legislatures and courts, town meetings, police and fire departments, motor vehicle licensing, and employment.

Unlike section 504 of the Rehabilitation Act of 1973, which only covers programs receiving Federal financial assistance, title II extends to all the activities of State and local governments whether or not they receive Federal funds.

Private entities that operate public accommodations, such as hotels, restaurants, theaters, retail stores, dry cleaners, doctors' offices, amusement parks, and bowling alleys, are not covered by title II but are covered by title III of the ADA and the Department's regulation implementing title III.

Public transportation services operated by State and local governments are covered by regulations of the Department of Transportation.

> DOT's regulations establish specific requirements for transportation vehicles and facilities, including a requirement that all new busses must be equipped to provide services to people who use wheelchairs.

## II. Overview of Requirements

State and local governments --

> May not refuse to allow a person with a disability to participate in a service, program, or activity simply because the person has a disability.
>
>> For example, a city may not refuse to allow a person with epilepsy to use parks and recreational facilities.
>
> Must provide programs and services in an integrated setting, unless separate or different measures are necessary to ensure equal opportunity.
>
> Must eliminate unnecessary eligibility standards or rules that deny individuals with disabilities an equal opportunity to enjoy their services, programs or activities unless "necessary" for the provisions of the service, program or activity.
>
>> Requirements that tend to screen out individuals with disabilities, such as requiring a driver's license as the only acceptable means of identification, are also prohibited.
>
>> Safety requirements that are necessary for the safe operation of the program in question, such as requirements for eligibility for drivers' licenses, may be imposed if they are based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.
>
> Are required to make reasonable modifications in policies, practices, and procedures that deny equal access to individuals with disabilities, unless a fundamental alteration in the program would result.
>
>> For example, a city office building would be required to make an exception to a rule prohibiting animals in public areas in order to admit guide dogs and other service animals assisting individuals with disabilities.
>
> Must furnish auxiliary aids and services when necessary to ensure effective communication, unless an undue burden or fundamental alteration would result.