EXHIBIT-L

**(3) Presumption of eligibility**

### (A) In general

For purposes of this section, an individual who has a disability or is blind as determined pursuant to title II or title XVI of the Social Security Act (42 U.S.C. 401 et seq. and 1381 et seq.) shall be—

> **(i)** considered to be an individual with a significant disability under section 705 (21)(A) of this title; and
>
> **(ii)** presumed to be eligible for vocational rehabilitation services under this subchapter (provided that the individual intends to achieve an employment outcome consistent with the unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the individual) unless the designated State unit involved can demonstrate by clear and convincing evidence that such individual is incapable of benefiting in terms of an employment outcome from vocational rehabilitation services due to the severity of the disability of the individual in accordance with paragraph (2).

### (B) Construction

Nothing in this paragraph shall be construed to create an entitlement to any vocational rehabilitation service.

## (4) Use of existing information

### (A) In general

To the maximum extent appropriate and consistent with the requirements of this part, for purposes of determining the eligibility of an individual for vocational rehabilitation services under this subchapter and developing the individualized plan for employment described in subsection (b) of this section for the individual, the designated State unit shall use information that is existing and current (as of the date of the determination of eligibility or of the development of the individualized plan for employment), including information available from other programs and providers, particularly information used by education officials and the Social Security Administration, information provided by the individual and the family of the individual, and information obtained under the assessment for determining eligibility and vocational rehabilitation needs.

### (B) Determinations by officials of other agencies

Determinations made by officials of other agencies, particularly education officials described in section 721 (a)(11)(D) of this title, regarding whether an individual satisfies one or more factors relating to whether an individual is an individual with a disability under section 705 (20)(A) of this title or an individual with a significant



## US CODE COLLECTION

EXHIBIT-M

Collection home                          Search                          Do



TITLE 29 > CHAPTER 16 > GENERAL > § 718                     Prev |

## § 718. Traditionally underserved populations

*Release date: 2003-05-15*

### (a) Findings

With respect to the programs authorized in subchapters II through VII of this chapter, the Congress finds as follows:

#### _(1) Racial profile

The racial profile of America is rapidly changing. While the rate of increase for white Americans is 3.2 percent, the rate of increase for racial and ethnic minorities is much higher: 38.6 percent for Latinos, 14.6 percent for African-Americans, and 40.1 percent for Asian-Americans and other ethnic groups. By the year 2000, the Nation will have 260,000,000 people, one of every three of whom will be either African-American, Latino, or Asian-American.

#### _(2) Rate of disability

Ethnic and racial minorities tend to have disabling conditions at a disproportionately high rate. The rate of work-related disability for American Indians is about one and one-half times that of the general population. African-Americans are also one and one-half times more likely to be disabled than whites and twice as likely to be significantly disabled.

#### (3) Inequitable treatment

Patterns of inequitable treatment of minorities have been documented in all major junctures of the vocational rehabilitation process. As compared to white Americans, a larger percentage of African-American applicants to the vocational rehabilitation system is denied acceptance. Of applicants accepted for service, a larger percentage of African-American cases is closed without being rehabilitated. Minorities are provided less training than their white counterparts. Consistently, less money is spent on minorities than on their white counterparts.

#### (4) Recruitment

Recruitment efforts within vocational rehabilitation at the level of preservice training, continuing education, and in-service training must focus on bringing larger numbers of minorities into the profession in order to provide appropriate practitioner knowledge, role models, and sufficient manpower to address the clearly changing demography of vocational rehabilitation.

### (b) Outreach to minorities

#### (1) In general

For each fiscal year, the Commissioner and the Director of the National Institute on Disability and Rehabilitation Research (referred to in this

Search this title:

Search Title 29

Notes
Updates
Parallel authorities
(CFR)
Your comments

EXHIBIT- N Pg: I

# *oppaga*

# Progress Report



September 2003

Report No. 03-51

# Agency Implements Recommendations to Improve Vocational Rehabilitation Services

## *at a glance*

Subsequent to our previous report which found poor management by the Occupational Access and Opportunity Commission, the Legislature abolished the commission and transferred authority for the vocational rehabilitation program to the Department of Education.

The department is in the process of implementing our recommendations to assess performance and service capacity, and develop a plan that includes prioritizing any additional privatization initiatives according to need; include performance standards in contracts; and better communicate planned program changes with stakeholders.

Program performance has improved since the Department of Education assumed responsibility for the Vocational Rehabilitation program. While the total number of customers served has stayed relatively constant, key employment outcomes are improving.

## Scope ———————

In accordance with state law, this progress report informs the Legislature of the actions taken in response to the findings and recommendations included in our 2002 review of the Occupational Access and Opportunity

Commission and its oversight of the vocational rehabilitation program. [1, 2]

## Background ———————

The vocational rehabilitation program provides individually tailored services and job training to people with disabilities who want to work. The program's goal is to enable its customers to maintain long-term employment and become self-sufficient. Under federal regulations, vocational rehabilitation programs must give priority to serving clients with the most significant disabilities. [3]

Vocational rehabilitation services have traditionally been delivered by a mix of state employees and private providers. Federal law requires that state employees must deliver certain client services, including determining a client's eligibility for program services, approving the services, and closing the client's case. In addition, state employees have traditionally provided other basic services, including client recruitment, intake, and case management. These services are provided through six area offices that supervise 24 service

---

[1] Section 11.45(7)(f), *F.S.*

[2] *Special Examination, Responsibilities Not Fulfilled by Occupational Access and Opportunity Commission; Program Performance Declines*, OPPAGA Report No. 02-06, January 2002.

[3] 34 *CFR* 361.35(a) and 361.36(a).

*Office of Program Policy Analysis and Government Accountability*
*an office of the Florida Legislature*

*Progress Report*

EXHIBIT- N Pg. 2

regions. The program's rehabilitation services such as medical treatment, counseling, and job training services are generally provided by private providers.

In 1999 the Legislature changed the vocational rehabilitation program's governance structure by creating the Occupational Access and Opportunity Commission to head the program with the directive to expand service capacity through the use of private providers. [4] Prior to this change the Division of Vocational Rehabilitation in the Department of Labor and Employment Security delivered vocational rehabilitation services.

In Fiscal Year 2001-02, OPPAGA was directed by the Legislature to report on the commission's efforts to expand service capacity and whether it was sound public policy for the commission to continue to exist.

### Program Funding

The Vocational Rehabilitation Program is funded through a state and federal matching agreement. The state contributes 21.3% of program funding while the federal government provides 78.7%, returning $3.69 for every dollar expended. For state Fiscal Year 2003-04 the Legislature appropriated $25,094,608 in general revenue and Florida is expected to receive $75,441,409 in federal funds. The program was appropriated 916.50 full-time equivalent positions.

# Prior Findings ———————

### The Occupational Access and Opportunity Commission performed poorly

Our 2002 review determined that the Occupational Access and Opportunity Commission had not effectively managed the Vocational Rehabilitation Program and that program outcomes had declined since the commission's creation. The commission had not met its goal of substantially increasing service capacity through the use of private rehabilitation providers. Instead, the commission had focused its efforts on privatizing basic services performed by state employees. While privatizing program

services may produce benefits, the commission's effort was not well planned or managed, which resulted in higher costs and a decline in program performance. Moreover, the federal government designated Florida as a high-risk grantee, due in part to concerns over the privatization effort.

We concluded that it would not be sound public policy to continue the commission. We recommended that the Legislature eliminate the Occupational Access and Opportunity Commission and that the Department of Education be given primary responsibility for administering the vocational rehabilitation program.

### The commission's contract management efforts had serious flaws

Our prior review determined that the commission's privatization efforts had not been adequately planned. The commission did not plan or conduct any studies to determine areas in need of expanded capacity or whether it was feasible to pursue its goal of privatizing all program services. We recommended that program management identify weaknesses in the program's current service capacity by region, and develop a plan to prioritize additional privatization initiatives according to identified needs.

The commission's contracting methods were seriously flawed. It had entered into contracts in three regions as demonstration sites to determine the effectiveness of delivering basic services through private providers rather than state-employed counselors. Private providers were awarded large start-up funding with little documented basis for the awards. In addition, payment levels were not adjusted when it was determined that state employees would continue to provide many of the services. Finally, the contracts did not include adequate performance measures. The net effect of these contracting problems was an increase in service costs in these three regions with a decrease in accountability for program funds.

We recommended that program management include specific performance standards in all contracts for services and that a system be

---

[4] Chapter 99-240, *Laws of Florida.*

EXHIBIT- N Pg. 3

*Progress Report*

developed to evaluate the cost benefit of its privatization contracts.

# Current Status

## *The Occupational Access and Opportunity Commission was eliminated*

The 2002 Legislature enacted Ch. 2002-22, *Laws of Florida,* which eliminated the Occupational Access and Opportunity Commission and gave program oversight to the Department of Education. The Department of Education took responsibility for the program in April 2002.

## *Program performance has improved*

The program's performance in serving vocational rehabilitation clients has improved since the Department of Education assumed control of the program, reversing the decline experienced under the commission. As shown in Exhibit 1, the number of clients gainfully employed, those placed in competitive settings, and the number of significantly disabled customers gainfully employed for more than 90 days increased substantially in Fiscal Year 2002-03, after the department became responsible for program management. Although the program experienced a decline in the total number of clients reviewed for eligibility, the department believes this may have occurred due to self-screening by clients when it was better communicated to clients that the program served only clients with a goal of employment.

The federal government kept the program on its high risk status list for the 2002-03 federal fiscal year. The department submitted a corrective action plan, which was reviewed by the federal Rehabilitation Services Administration in March 2003 to determine whether the program corrected the deficiencies that caused it to be placed in this status. The program may be removed from high risk status beginning in the 2003-04 federal fiscal year. [5]

## *Department is addressing needs assessment and contracting weaknesses*

The Department of Education completed a comprehensive needs assessment of the vocational rehabilitation program in December 2002. [6] This needs assessment utilized existing data about program performance and used broad stakeholder input to identify the most important issues. Stakeholder groups included service providers, employers, clients, representatives of area workforce boards, the Florida Rehabilitation Council and vocational rehabilitation staff. Stakeholder groups were asked to set priorities for addressing gaps and to identify the causes and solutions to close these gaps.

---

[5] The federal government has not indicated when it will render a decision on program status. However, program management believes they will receive an opinion when the program receives its 2003-04 grant.

[6] *An Assessment of Program Performance and Service Capacity of the Division of Vocational Rehabilitation,* December 2002, Florida Department of Education.

**Exhibit 1**
**Key Program Outcomes Are Returning to Previous Levels**

| | Department of Labor 1998-99 | Occupational Access and Opportunity Commission (October 1999 – April 2002) | | | Department of Education 2002-03 |
|---|---|---|---|---|---|
| | | 1999-00 | 2000-01 | 2001-02 | |
| Customers reviewed for eligibility | 25,507 | 23,958 | 23,547 | 26,262 | 26,003 |
| Percentage of eligibility determinations made within 60 days (federal law) | 89.8% | 89.4% | 85.2% | 72.1% | 72.4% |
| Number of significantly disabled customers gainfully employed at least 90 days | 8,075 | 7,929 | 6,888 | 6,593 | 7,641 |
| Number of all other customers gainfully employed | 1,437 | 2,004 | 1,859 | 1,986 | 2,346 |
| Number of customers placed in competitive employment | 9,262 | 9,690 | 8,510 | 8,459 | 9,912 |

Source: OPPAGA analysis, Department of Education analysis.

*Progress Report*                    EXHIBIT-N Pg. 4

The department used the information gained through the needs assessment process to develop a five-year strategic plan which was disseminated in April 2003. This plan identifies multiple strategies that will be used to address specific program priorities including the use of outsourcing when it is cost beneficial and expands service delivery, efficiency, and client choice.

We believe that the program should continue its efforts to identify gaps in providing program services and implement solutions to close those gaps. The program should continually measure its progress toward addressing identified weaknesses in service provision.

The department also has taken action to improve its provider contracts in the two areas that continue as privatization pilot projects. [7] In May 2003, the department formed a team to evaluate the two remaining contracts and recommend changes and improvements.

---

[7] Two of the three pilot privatization projects initiated by the Occupational Access and Opportunity Commission are still in operation. In October 2002, the vendor for the third project decided to discontinue its contract. Clients were transitioned back to the Division of Vocational Rehabilitation.

The team included both state employees and contractor employees. The team proposed a performance contracting system in which payments will be based on a system of performance measurement, and provider payments will be reduced by a predetermined per unit cost if pre-identified goals are not met. The department also is including performance measures in its contracts for employment services, supported employment and vocational evaluation.

The department also has developed and implemented a comprehensive contracting system which focuses on legal compliance, accountability and client outcomes and provides procedures for seven inter-related cycles in the contracting process including: planning and procurement; negotiations and final agreement; contract document and execution; contract management; contract monitoring; invoicing and payment; and closeout and termination. The manual that implements this system was recently presented to vocational rehabilitation agencies across the nation at the vocational rehabilitation financial management conference. We believe these are positive steps to address the contracting weaknesses identified in our prior report, and recommend that the program continue to evaluate its contracting system on a periodic basis and implement improvements as needed.

---

OPPAGA provides objective, independent, professional analyses of state policies and services to assist the Florida Legislature in decision making, to ensure government accountability, and to recommend the best use of public resources. This project was conducted in accordance with applicable evaluation standards. Copies of this report in print or alternate accessible format may be obtained by telephone (850/488-0021 or 800/531-2477), by FAX (850/487-3804), in person, or by mail (OPPAGA Report Production, Claude Pepper Building, Room 312, 111 W. Madison St., Tallahassee, FL 32399-1475). *Florida Monitor:* http://www.oppaga.state.fl.us/

Project supervised by Debbie Gilreath (850/487-9278)
Project conducted by Janice Foley (850/487-9266)
Gary VanLandingham, OPPAGA Interim Director

EXHIBIT-O

**YOUR**
**Florida Department of Education**

Friday, May 21, 2004

Site Index | GO | Enter Keywor

**Press Room**

Skip Navigation
FLDOE Home

Site Index

Contact DOE

Students

Parents

Educators

K12 Schools

Community
Colleges

Colleges &
Universities

Accountability,
Research &
Measurement

News in Florida

State Board
of Education

Florida Board
of Governors

Commissioner

Departments &
Offices

**PRESS RELEASE**

October 7, 2003

Frances Marine
(850) 245-0413
**DOEPressOffice@fldoe.org DOEPressOffice@fldoe.org**

**Vocational Rehabilitation Meeting Federal Requirements**
*Improvement in VR program also lauded by recent OPPAGA*
*report*

TALLHASSEE — Education Commissioner Jim Horne today announced
that Florida's Vocational Rehabilitation (VR) program is now meeting
federal requirements imposed by the Rehabilitation Services
Administration (RSA). The federal government matches VR's state
dollars about four to one. Last year, Florida received $92 million to
provide vocational services in the state.

"I am pleased to see the tremendous improvement in our Vocational
Rehabilitation program, which serves thousands of disabled Floridians.
Last year, an additional 1,400 Floridians gained employment thanks to
the program - a 14 percent increase over the previous year. Thanks to
the efforts of dedicated professionals, we have turned Florida's
Vocational Rehabilitation program around and ensured that disabled
Floridians will continue to receive the assistance they need to become
self-sufficient and contribute to our economy," said Commissioner
Horne. "In fact, our VR contracting program was recently presented as a
model for other states at a national conference."

Auditors found in October 2000 that VR was not meeting federal
requirements. Commissioner Horne appointed Loretta Costin to take
over VR in January 2002 to bring it back into federal compliance. VR
issued a corrective action plan in February 2002 and federal officials
visited the program in March 2003. Last week, the federal government
found the VR program to be in compliance with federal requirements.

Florida's Vocational Rehabilitation program is committed to helping
people with disabilities become part of the workforce. VR assists people
with disabilities with training, medical treatment, and accommodations
so they may become employed.

"We have all worked very hard to make sure all federal requirements are
being met," said Costin. "It took a lot of effort to improve the division's
processes to comply with required timeframes. The end result is that VR
consumers in Florida will be better served."



*EXHIBIT - P*

PAGE



## FLORIDA DEPARTMENT OF EDUCATION
### DIVISION OF VOCATIONAL REHABILITATION
### MEDICAL / PSYCHOLOGICAL CONSULTATION

**To:** David Fleischmann

**E-Mail:**

**Individual's Name:** Lisa Hamilton          **SSN:** 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

**V.R. Status:** Applicant

**Primary disability:** Histrionic Personality Disorder

**Secondary disability:** Panic D/O w/agoraphobia;  Depressive Disorder NOS

>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>

**QUESTIONS:**

Due to Lisa's long term, chronic mental illnesses and Personality Disorder, do you concur with Dr Wells that Lisa is presently too severe to benefit from VR services, in terms of an employment outcome?

**RECEIVED**

NOV 24 2003

VOCATIONAL REHABILITATION
UNIT VO6

**Counselor:** Judith A. Whitaker          **Date:** 11/21/2003

>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>

**CONSULTANTS RESPONSE:**

*I agree with the psychological evaluation that presently LISA is too severe (unstable) to benefit from V.R. Services*

*11/24/03*

Consultant's Signature          Date
(Please return by mail or in person)

# EXHIBIT Q

This letter is to confirm that I review work performed by Joyce A. Wells, Psy.D. while she is awaiting licensure. I reviewed the evaluation performed on Lisa Hamilton on October 9 and October 14, 2003, and agree with its conclusions.

Leonard J. Skizynski, Psy.D.
Licensed Psychologist PY0003764

*EXHIBIT-R*



Southeastern Program
Service Center
2001 Twelfth Avenue North
Birmingham, Alabama 35285

September 29, 2004

Refer To:  S2D45A8

LISA HAMILTON
4470 SCENIC LAKE DR
ORLANDO FL 32808

Dear Ms. Hamilton:

You asked for copies of medical records from the Department of Vocational Rehabilitation. We have reviewed the records and decided that we must give them to your attorney or someone you choose who will review and discuss the information with you.  Because this is medical information, we prefer you choose a doctor or health worker if you do not have an attorney.  You can name any responsible individual who is capable of explaining the information to you.

You phone request for this information indicated you have a law suit pending, your attorney can request this information, with your written permission.

Please send us a signed statement which gives us the name and address of the person you want to receive your medical information. You may use the office address shown above to send us this information.  Please sign and date the statement giving us permission to provide the medical information you requested. You may use the address shown above to send us this information.

If you have any questions, you may call, write, or visit any Social Security office.  If you call or visit our office, please have this letter with you.

Sincerely,

Quittie C. Wilson
Assistant Regional Commissioner
Processing Center Operations


Relationships are based on trust.
And an amazing interest rate.

CITI® PLATINUM SELECT CARD

EXHIBIT-S

LisaHam7

# Mail

Inbox: **Message**    Sent    Trash    Draft    Folders...        Preferences | Help | Sign Out

       

Get Mail   Write Mail   Address Book   Reply   Reply All   Forward   Keep As New   Delete        Move Message To...  ▼

**Subject:** Joyce Wells, Psy.D.                                    « Previous  |  Next »
**Date:** 6/25/2004 2:04:07 PM Eastern Daylight Time
**From:** Tammey_Bailey@dca.ca.gov
**To:** lisaham7@netscape.net                                                    △


Dear Ms. Hamilton:

Joyce A. Wells Psy.D. was conferred a doctorate degree in psychology by
Newport University, a California approved school, on 12/11/1992.

She submitted the following post-doctoral hours:
01/04/1993 to 12/10/1993 at Mental Health Services of Osceola County, Inc.
under the supervision of Leonard J. Skizyndki, Psy.D.

Dr. Wells was issued California psychology license number PSY 18387 on
06/24/2002.  Her license will expire unless renewed on 10/31/2005.

Sincerely,

Tammey L. Bailey
Office Technician
California Board of Psychology
916-263-2699 ext. 0


                                                    « Previous  |  Next »

Get Mail   Write Mail   Address Book  | Reply   Reply All   Forward   Keep As New   Delete   Move Message To...  ▼

EXHIBIT-T



FLORIDA DEPARTMENT OF
# HEALTH

Jeb Bush
Governor

John O. Agwunobi, M.D., M.B.A., M.P.H.
Secretary

**Office of Disability Determinations**
**1321 EXECUTIVE CENTER DRIVE - TALLAHASSEE, FL 32399-2350**

H9 ZPATRIR / zpatrir 04/20/2004          July 13, 2004          20040713302754
                                                                      9121288

LISA HAMILTON                                  CASENBR: 9121288
4470 SCENIC LAKE DR
ORLANDO, FL 32808


This office is responsible for developing medical evidence in connection with your
Social Security Administration disability claim.

After reviewing your file, we find that we need some important information in
order to properly evaluate your claim. Please call me as soon as possible between
the hours of 9:00 AM and 4:00 PM, Monday thru Friday.

If we do not hear from you within ten days from the date of this letter, your
claim may be unnecessarily delayed or a decision may be made on your claim based
on the information currently in your file. Because we are missing some important
information, this could result in a finding that you are not eligible for
disability benefits.

- - Per our telephone today, this is to verify that I requested your records
  from Vocational Rehabilitation at 3191 Maguire Blvd in Orlando on 04/20/04.
  These records were received 06/29/04 and resulted in a continuation of your
  checks. This is not to certify the contents of these records as your folder
  is not currently in our office. I am in the process of getting the Office of
  Disability to return your folder to the Orlando, FL Social Security office.


                                        Sincerely,
                                        R. PATRICK
                                        Medical Disability Adjudicator


Fax Number: LOCAL   1-866-468-7776 or Toll Free Fax Number: 1-866-468-7776
          PHONE: TOLL FREE 1-888-846-1998 or 205-801-2419, EXT

M-40 D0040



*EXHIBIT U*

# Neighborhood Legal Services, Inc.

## THE OBLIGATION OF
## THE STATE VOCATIONAL REHABILITATION (VR) AGENCY TO
## PROVIDE ASSISTIVE TECHNOLOGY

*Ron Hager and Bill Mastroleo, National AT Advocacy Project*
*a project of Neighborhood Legal Services, Inc.  Buffalo, New York*
*(716) 847-0650, rhager@nls.org, bmastroleo@nls.org*

## I. Introduction

A. Congress, pursuant to Title I of the Rehabilitation Act, gives money to states to provide vocational rehabilitation (VR) services for persons with disabilities. 29 U.S.C. §§ 701 *et seq.*; 34 C.F.R. Part 361.

B. Final amendments to the vocational rehabilitation regulations appeared in the Federal Register on February 11, 1997. 62 Fed. Reg. 6308 (Feb. 11, 1997). These amendments are effective March 13, 1997. *Id.* Citations to the regulations are as amended.

C. On August 7, 1998, President Clinton signed into law the Workforce Investment Act of 1998. Included within the Workforce Investment Act were the Rehabilitation Act Amendments of 1998 (Rehab '98), reauthorizing the Rehabilitation Act through 2003.

1. The Workforce Investment Act (WIA) is a major federal effort to incorporate a myriad of federal job training programs into a coordinated, comprehensive system.

2. States are required to develop statewide and local plans and to include the vocational rehabilitation (VR) system in that process.

3. Although Congress had contemplated merging the VR system into the WIA, VR is maintained as a separate program to meet the vocational training needs of people with disabilities.

4. But, the vocational training opportunities of the state workforce investment system are clearly intended to be available to individuals with disabilities. *See* Section 2(b)(1)(A).

*[Note - References without U.S.C. citations are to the uncodified version of the law]*

5. Citations are to the Rehabilitation Act as amended by Rehab '98.

D. To receive funding, a state must submit a plan consistent with the law. 29 U.S.C. § 721.

E. It must designate a single state agency to administer the plan unless it designates a second agency to provide services to individuals who are blind. *Id.* § 721(a)(2).

F. VR agencies can fund a wide range of goods and services, including "rehabilitation



EXHIBIT V Pg 1

# The Florida Senate | flsena

December 06, 2004

Home
Session ▶
Committees ▶
Senators ▶
Information Center ▶
Statutes & Constitution ▶
Lobbyist Information ▶

**Jump To Bill**
Session: 2005
Bill #: [ ] Go

**Search Bill Text**
Session: 2005
Chamber: Senate [?]
[ ] Search

**Search Statutes**
Year: 2003 [?]
[ ] Search

**Find Your Legislators**
Enter Your Zip+4 Code:
[ ] Go [?]

Get Acrobat Reader / Windows Media Player 9 Series FREE
▶ myflorida.com
▶ myfloridahouse.gov

Select Year: 2003

## The 2003 Florida Statutes

| Title XXXII | Chapter 456 |
|---|---|
| REGULATION OF PROFESSIONS AND OCCUPATIONS | HEALTH PROFESSIONS AND OCCUPATIONS: GENERAL PROVISIONS |

456.065  Unlicensed practice of a health care profession; intent; cease and desist penalties; enforcement; citations; fees; allocation and disposition of moneys coll

(1)  It is the intent of the Legislature that vigorous enforcement of licensure regulat health care professions is a state priority in order to protect Florida residents and vi potentially serious and dangerous consequences of receiving medical and health car unlicensed persons whose professional education and training and other relevant qu have not been approved through the issuance of a license by the appropriate regula the department when there is no board. The unlicensed practice of a health care pr performance or delivery of medical or health care services to patients in this state v active license to practice that profession, regardless of the means of the performan of such services, is strictly prohibited.

(2)  The penalties for unlicensed practice of a health care profession shall include th

(a)  When the department has probable cause to believe that any person not license department, or the appropriate regulatory board within the department, has violate of this chapter or any statute that relates to the practice of a profession regulated b department, or any rule adopted pursuant thereto, the department may issue and d person a notice to cease and desist from such violation. In addition, the department deliver a notice to cease and desist to any person who aids and abets the unlicense profession by employing such unlicensed person. The issuance of a notice to cease a not constitute agency action for which a hearing under ss. 120.569 and 120.57 may the purpose of enforcing a cease and desist order, the department may file a procee name of the state seeking issuance of an injunction or a writ of mandamus against a violates any provisions of such order.

(b)  In addition to the remedies under paragraph (a), the department may impose by administrative penalty not to exceed $5,000 per incident. The citation shall be issue subject and shall contain the subject's name and any other information the departm to be necessary to identify the subject, a brief factual statement, the sections of th violated, and the penalty imposed. If the subject does not dispute the matter in the the department within 30 days after the citation is served, the citation shall become of the department. The department may adopt rules to implement this section. The be a fine of not less than $500 nor more than $5,000 as established by rule of the de Each day that the unlicensed practice continues after issuance of a notice to cease constitutes a separate violation. The department shall be entitled to recover the co investigation and prosecution in addition to the fine levied pursuant to the citation. citation may be made by personal service or by mail to the subject at the subject's l

EXHIBIT V Pg. 2

address or place of practice. If the department is required to seek enforcement of t
desist or agency order, it shall be entitled to collect its attorney's fees and costs.

(c)  In addition to or in lieu of any other administrative remedy, the department ma
imposition of a civil penalty through the circuit court for any violation for which the
may issue a notice to cease and desist. The civil penalty shall be no less than $500 a
than $5,000 for each offense. The court may also award to the prevailing party cour
reasonable attorney fees and, in the event the department prevails, may also awarc
costs of investigation and prosecution.

(d)  In addition to the administrative and civil remedies under paragraphs (b) and (c
addition to the criminal violations and penalties listed in the individual health care

1.  It is a felony of the third degree, punishable as provided in s. 775.082, s. 775.08.
to practice, attempt to practice, or offer to practice a health care profession witho
valid Florida license to practice that profession. Practicing without an active, valid l
includes practicing on a suspended, revoked, or void license, but does not include p
attempting to practice, or offering to practice with an inactive or delinquent license
up to 12 months which is addressed in subparagraph 3. Applying for employment for
requires a license without notifying the employer that the person does not currently
valid, active license to practice that profession shall be deemed to be an attempt o
practice that health care profession without a license. Holding oneself out, regardle
of communication, as able to practice a health care profession or as able to provide
require a health care license shall be deemed to be an attempt or offer to practice
without a license. The minimum penalty for violating this subparagraph shall be a fi
and a minimum mandatory period of incarceration of 1 year.

2.  It is a felony of the second degree, punishable as provided in s. 775.082, s. 775.C
775.084, to practice a health care profession without an active, valid Florida license
that profession when such practice results in serious bodily injury. For purposes of t
"serious bodily injury" means death; brain or spinal damage; disfigurement; fracture
of bones or joints; limitation of neurological, physical, or sensory function; or any c
required subsequent surgical repair. The minimum penalty for violating this subpara
fine of $1,000 and a minimum mandatory period of incarceration of 1 year.

3.  It is a misdemeanor of the first degree, punishable as provided in s. 775.082 or s
practice, attempt to practice, or offer to practice a health care profession with an i
delinquent license for any period of time up to 12 months. However, practicing, atte
practice, or offering to practice a health care profession when that person's license
inactive or delinquent for a period of time of 12 months or more shall be a felony of
degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The minimu
violating this subparagraph shall be a term of imprisonment of 30 days and a fine of

(3)  Because all enforcement costs should be covered by professions regulated by th
the department shall impose, upon initial licensure and each licensure renewal, a sr
per licensee to fund efforts to combat unlicensed activity. Such fee shall be in addit
fees collected from each licensee. The department shall make direct charges to the
Quality Assurance Trust Fund by profession. The department shall seek board advice
enforcement methods and strategies. The department shall directly credit the Medic
Assurance Trust Fund, by profession, with the revenues received from the departme
enforce licensure provisions. The department shall include all financial and statistic
resulting from unlicensed activity enforcement as a separate category in the quarte
management report provided for in s. 456.025. For an unlicensed activity account, a
remains at the end of a renewal cycle may, with concurrence of the applicable boar
department, be transferred to the operating fund account of that profession. The de
also use these funds to inform and educate consumers generally on the importance
licensed health care practitioners.

*Exhibit V Pg. 3*

(4)  The provisions of this section apply only to health care professional practice act by the department.

(5)  Nothing herein shall be construed to limit or restrict the sale, use, or recommer use of a dietary supplement, as defined by the Food, Drug, and Cosmetic Act, 21 U.S long as the person selling, using, or recommending the dietary supplement does so i with federal and state law.

**History.**--s. 73, ch. 97-261; s. 84, ch. 2000-160; s. 35, ch. 2000-318; s. 54, ch. 2001·

**Note.**--Former s. 455.637.

---

**Session:**  Bills · Calendars · Journals · Citator · Search · Appropriations · Redistricting · Vide Reports
**Committees:**  Committee Pages · Committee Publications · Meeting Packets · Committee Reports
**Senators:**  President's Page · Member Pages · District Information · Find Your Legislators
**Information Center:**  Introduction · About the Legislature · Publications · Glossary · Help · Emp
**Statutes & Constitution:**  Introduction · View Statutes · Search Statutes · Constitution · Laws of
**Lobbyist Information:**  Introduction · Lists · Legislative Directory · Guide Book · Forms

Disclaimer: The information on this system is unverified. The journals or printed bills of the respective chambers should be consulted for of
Copyright © 2000-2004 State of Florida.    Privacy Statement.





EXHIBIT-W

**US CODE COLLECTION**



Collection home                                    Search                                    Donate

TITLE 18 > PART I > CHAPTER 63 > § 1346                    Prev | Next

**§ 1346. Definition of "scheme or artifice to defraud"**

*Release date: 2004-08-06*

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

*Search this title:*

[                    ]

[ Search Title 18 ]

Notes
Updates
Parallel authorities
(CFR)
Your comments

Prev | Next

Credits                        About us                        Send email

EXHIBIT. Y   Pg. 1

# Audit of Perkins III Performance
# Data at OVAE



**FINAL AUDIT REPORT**
**Control Number ED-OIG/A03-D0013**
**MAY 2004**



Our mission is to promote the efficiency,
effectiveness, and integrity of the
Department's programs and operations.

U.S. Department of Education
Office of Inspector General
Philadelphia, Pennsylvania

_EXHIBIT-Y_ Pg. 2

# NOTICE

**Statements that management practices need improvement, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General. Determinations of corrective action to be taken will be made by appropriate Department of Education officials.**

**In accordance with the Freedom of Information Act (5 U.S.C. §552), reports issued by the Office of Inspector General are available, if requested, to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act.**

EXHIBIT-Y   Pg. 3

---

## Executive Summary

The purpose of this audit was to assess management controls at the U.S. Department of Education (ED), Office of Vocational and Adult Education (OVAE) to ensure that performance data collected and reported to Congress for the Carl D. Perkins Vocational and Technical Education Act of 1998, (Perkins III) Public Law 105-332, for the 2000-2001 program year (PY) (July 1, 2000, through June 30, 2001) were complete, accurate, and reliable.

While OVAE had a process to collect and review the Perkins III performance data, it needs to strengthen controls over its review and reporting processes to ensure that the data are complete, accurate, and reliable.  Specifically, our audit disclosed that:

- States were not submitting complete Perkins III performance data to ED.  A review of performance data in the Perkins III Performance Report to Congress for the 2000-2001 PY disclosed that 57 percent (30 of 53 states and U.S. territories) of states did not provide complete data to ED.
- OVAE needs to work with states to assure that performance measures are valid.  We found that 34 percent (18 of 53 states and U.S. territories) of states use the same performance measures for several sub-indicators.
- OVAE's monitoring process did not include Workforce Investment Act (WIA) incentive award recipients for monitoring visits.[1]  During our audit work at three state agencies (Florida, Kentucky, and Indiana), we found that each of the three states audited received an incentive award for the 2000-2001 PY and had problems with the quality of the data reported.
- Not all states complied with ED's Consolidated Annual Report (CAR) reporting instructions. We found that some state's Improvement Strategies were not specific to the sub-indicators for which the state did not meet its adjusted level.

We recommend that OVAE develop additional procedures and controls to ensure that data submitted from the states meet the criteria of each sub-indicator, in addition to ensuring that the Perkins III data reported are complete, accurate, and reliable.

We provided a copy of our draft report to OVAE.  In its response to the draft report, a copy of which is included as an attachment, OVAE indicated general concurrence with the findings and recommendations contained in the report.  For each recommendation, OVAE provided details of actions taken to implement the recommendations.  We appreciate OVAE's efforts to implement the recommendations.

---

[1] The Department of Labor, in collaboration with the Department of Education, nominates states that are eligible to apply for WIA incentive awards under WIA regulations.  These funds are available to support innovative workforce development and education activities.

Case 6:04-cv-00636-JA-JGG  Document 85-3  Filed 12/06/04  Page 21 of 25 PageID 543



EXHIBIT-Z-1

## US CODE COLLECTION



Collection home

Search

Donate

**TITLE 18 > PART I > CHAPTER 63 > § 1341**

Prev | Nex

# § 1341. Frauds and swindles

*Release date: 2004-08-06*

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

*Search this title:*

[                    ]

[ Search Title 18 ]

Notes
Updates
Parallel authorities
(CFR)
Your comments

Credits

About us

Prev | Nex

Send emai



EXHIBIT-Z-2

## US CODE COLLECTION

**Collection home**                                                      **Search**                                    Donate

**TITLE 18 > PART I > CHAPTER 63 > § 1343**                              Prev | Nex

## § 1343. Fraud by wire, radio, or television

*Release date: 2004-08-06*

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

*Search this title:*

[                    ]

[  Search Title 18  ]

Notes
Updates
Parallel authorities
(CFR)
Your comments

**Credits**                              **About us**                                   Prev | Nex
                                                                                        Send emai

**AFFIDAVITS**
**Submitted by The Plaintiff**
**Lisa Hamilton**

**Under Penalty of Perjury I, Lisa Hamilton, state the following statements as truth:**

**A.)** I, Lisa Hamilton, am an African-American.

**B.)** I, Lisa Hamilton, informed Roy Cosgrove (an employee of the Ombudsman's Office of The Florida Department of Education/Division of Vocational Rehabilitation Services) in November, 2003 that I was notified by Rebecca Hollister of the Florida Department of Health that Joyce A. Wells was denied licensure to practice Psychology in the State of Florida on November 14, 2003. Roy Cosgrove in turn informed me in November, 2003 that he was instructed to tell me Joyce A. Wells had a Supervisor by the name of Leonard Skizynski.

**C.)** I, Lisa Hamilton, state that I have been emotionally scarred by the direct actions of the Defendants The Florida Department of Education/Division of Vocational Rehabilitation Services, Judy Whitaker, David Givens, Joyce A. Wells , David E. Bogert and Dr. Leonard Skizynski and suffer headaches and chest pains every day I have to deal with my case against the six Defendants The Florida Department of Education/Division of Vocational Rehabilitation Services, Judy Whitaker, David Givens, Joyce A. Wells , David E. Bogert and Dr. Leonard Skizynski to vindicate my name.

**D.)** I, Lisa Hamilton, have never met Dr. Leonard Skizynski face-to-face or in a Doctor-Client setting to justify Dr. Leonard Skizynski or The Florida Department

of Education accepting Dr. Leonard Skizynski's findings of my mental state as

unstable and too severe to benefit from VR services. I, Lisa Hamilton,

do not know what Dr. Leonard Skizynski physically looks like. I, Lisa Hamilton,

spoke with Dr. Leonard Skizynski once over the telephone for one minute in

November, 2003 where Dr. Leonard Skizynski asserted to me that he was in fact

Joyce A. Wells Supervisor. Dr. Leonard Skizynski stated in this telephone

conversation that he had never heard of my name prior to my phone call to him.

**E.)** I, Lisa Hamilton, have never met Dr. David Fleischmann face-to-face or in a

Doctor-Client setting to justify Dr. David Fleischmann or The Florida Department

of Education accepting Dr. David Fleischmann's findings of my mental state as

unstable and too severe to benefit from VR services. I, Lisa Hamilton, do not

know what Dr. David Fleischmann physically looks like. I, Lisa Hamilton spoke

with Dr. David Fleischmann once over the Phone in October 2004 - one year

after the Psychological Evaluation was administered by Joyce A. Wells and

David E. Bogert.

**F.)** I, Lisa Hamilton, have suffered physical and emotional pain as a direct result

of the Defendants The Florida Department of Education/Division of Vocational

Rehabilitation Services, Judy Whitaker, David Givens, Joyce A. Wells , David E. Bogert

and Dr. Leonard Skizynski actions. The Defendants illegal and discriminatory

behavior toward me has resulted in the dissolution of my business Lisa Hamilton

Music Publishing Inc. and the inability of me to move forward with my dreams of

being self-employed by my having to focus on representing my self in my lawsuit

against the above named Defendants who conspired together to deprive me of

my Constitutional rights through fraud and discrimination.

G.) I, Lisa Hamilton, certify as true that the actions of all named Defendants and

all actions mentioned in my second Amended Complaint is the direct cause of

me not being able to make money in my business Lisa Hamilton Music

Publishing Inc. at the present time.

ANTHONY BECKER
MY COMMISSION # DD 008214
EXPIRES: March 14, 2005
Bonded Thru Notary Services

LISA HAMILTON

DATE: 12/6/2004